HENRY WEGENER, Appellee, v. EMMETSBURG NATIONAL BANK et al., Appellants.

**BILLS AND NOTES:** Actions—Nonpermissible Relief. The maker of
1 a negotiable promissory note who brings an action against the transferee and prays solely for the possession of the note on the ground that the execution of the note was fraudulently induced, has no possible interest in, and may not for any reason defend against, an outstanding certificate of deposit executed by the transferee as part of the purchase price of the note, (1) when the maker shows that the said transferee is *not* a holder in due course, or (2) when he shows that the transferee *is* a holder in due course, but makes no effort to impress a trust on said certificate.

**TRUSTS:** Constructive Trusts—Innocent Party. The protection
2 afforded to innocent purchasers of property of whatever kind, against the impressment of a trust because of hidden equities, will operate in favor of a nonnegotiable instrument, as well as in favor of a negotiable one.

**BILLS AND NOTES:** Indorsement—Prima-facie Authority. The in-
3 dorsement of a promissory note in the name of the payee, by the payee's agent in possession, is *prima facie* an authorized indorse-

ment.    Necessarily, such indorsement is unassailable when later ratified by an agent of payee who had unlimited authority to indorse.

**CONTRACTS: Effect of Invalidating Fraud.** A fraudulently induced contract is, nevertheless, a contract until rescinded.

**BILLS AND NOTES: Bona-fide Purchasers—Scope of Protection.** It is no defense to a negotiable promissory note in the hands of a holder in due course (1) that there was no consideration therefor, or (2) that the contract out of which the note arose had been materially altered by the payee of the note, or (3) that said contract had never been performed.

*Appeal from Palo Alto District Court.*—JAMES DE LAND, Judge.

MAY 15, 1923.

SUIT for the possession and cancellation of certain promissory notes executed by the plaintiff, as maker, to the Midland Packing Company, as payee. Said notes were held by the Emmetsburg National Bank, as the indorsee thereof. The decree was entered for plaintiff, as prayed. The same decree canceled also certain certificates of deposit executed by the Emmetsburg National Bank to the Midland Packing Company, as payee, the said certificate being held by the Continental National Bank of Sioux City, as indorsee. Each defendant bank has appealed.— *Reversed.*

*McCarty & McCarty, F. E. Gill,* and *Davidson & Burt,* for appellants.

*E. A. & W. H. Morling,* for appellee.

EVANS, J.—The pleadings are voluminous and complicated, though the salient facts are few. A preliminary statement of the facts will simplify the statement of the issues.

The plaintiff, being induced by fraudulent representations, contracted to purchase 250 shares of capital stock in the Midland Packing Company at par value of $100 per share. Under the contract, he was to pay one fourth the contract price in cash and to give his notes for the balance. In lieu of the cash payment, however, he executed and delivered to the packing com-

pany his two negotiable promissory notes for an aggregate sum of $6,250. This was on November 20, 1919. Immediately thereafter, the payee sold the notes to the Emmetsburg National Bank (now in the hands of a receiver), of which bank Wegener was a director. It paid full value therefor on a basis of 7 per cent interest. In payment therefor, it delivered to the packing company its certificate of deposit for $5,625, and paid the difference in cash. Shortly thereafter, the packing company negotiated the certificate of deposit to the Continental National Bank of Sioux City, which paid full value therefor, on the basis of 7 per cent interest. This certificate was drawn to mature in 12 months after date. Plaintiff's notes were drawn to mature on November 1, 1920, and December 1, 1920, respectively. Shortly prior to November 22, 1920, on which date this suit was begun, the plaintiff notified the Midland Packing Company of his repudiation or rescission of the contract of subscription and of the notes. He thereupon brought this action against the Emmetsburg National Bank alone. He tendered payment to the bank of the full amount paid by it for the notes in excess of the certificate of deposit for $5,625. He averred that the bank had paid nothing upon such certificate, and was, therefore, not entitled to receive anything because of the issuance thereof. Upon this theory, he averred that the bank had acquired the notes and was still holding them for no other consideration than the amount of cash paid in excess of $5,625, and that, because of his tender, the bank was holding the same without consideration. He also pleaded facts constituting fraud on the part of the Midland Packing Company which would have constituted a good defense to the notes as against such payee. The prayer of his petition was as follows:

"Wherefore plaintiff demands judgment against the defendant for the immediate possession of the said two promissory notes, or for the value thereof, and costs."

Though several later amendments to the petition were filed, this prayer was never amended. Up to this point, the action was in the form of detinue, and was pending at law. Thereupon, the Emmetsburg National Bank, being at that time the only defendant which had been served with notice, filed its answer and cross-petition, wherein it alleged its purchase in good faith and owner-

ship of the notes in question, and asserted its right to recover thereon from the plaintiff, and asked judgment thereon. It also averred that the Continental National Bank of Sioux City was making demands upon it for the payment of the certificate of $5,625, as the alleged indorsee of the same from the Midland Packing Company. It prayed that the Continental National Bank be made a party defendant, and that such bank and the plaintiff be required to interplead, and that the court should adjudicate which of said parties was entitled to said certificate or its proceeds. It offered to pay the full amount thereof to whichever party should be found thus entitled. Pursuant to this pleading and the order of the court, the Continental National Bank was brought in by notice. It filed various motions in resistance to its being thus interpleaded, and alleged misjoinder, all of which objections were overruled. It then pleaded to the merits, set up its certificate, and averred its ownership thereof in good faith and for full value, and that the same was duly indorsed to it by the payee. It prayed judgment thereon against the issuing bank. To this cross-petition by the Continental National Bank, the Emmetsburg National Bank made no answer or reply. The plaintiff replied by a general denial, and by specific denial of every allegation of the cross-petition. He specifically denied that the said certificate was ever the property of the said Continental National Bank, or that there is any sum due thereon to said bank. He also averred that the "said Continental Bank had full notice and knowledge in the premises." This was the only affirmative averment. Before the evidence was taken, the parties, by stipulation, transferred the case to the equity side, and it was so tried. The decree canceled the certificate and canceled the notes.

This is a companion case to that of *Frink v. Commercial Bank of Emmetsburg,* and appears to have been tried at or about the same time, and under the momentum of the trial of that case. We have had occasion to consider that case on appeal. *Frink v. Commercial Bank of Emmetsburg,* 195 Iowa 1011. The case involved largely the same legal questions, and our discussion in the *Frink* case has much application to the present one. We shall avoid, as far as may be, undue repetition herein of the discussion therein.

I.   Each defendant has appealed.   We give our first consideration to the appeal of the Continental National Bank.   What right or remedy was open to the plaintiff, as against this defendant?   We will assume that he was defrauded by the Midland Packing Company, which is not a party to the case.   He had a right to set up the fraud as a defense to the notes, as against the payee or any other person not a holder in due course.   We will assume that he had a right also to bring a suit in equity for the cancellation of the notes, as against any holder not in due course.   If, therefore, the Emmetsburg National Bank was not a holder in due course, and was charged with notice of the fraud by which the notes were obtained, then plaintiff had a complete remedy by proceeding against the Emmetsburg National Bank alone, and obtaining a cancellation of the notes.   In such a case, he had no legal interest whatever in obtaining a cancellation of the certificate of deposit issued by the one bank and held by the other.

1. BILLS AND
NOTES: actions:
nonpermissible
relief.

On the other hand, if the Emmetsburg National Bank was a holder in due course, and was, therefore, not subject to the maker's defense thereto, then the plaintiff was entitled in equity to impress a trust upon the certificate of deposit, as a part of the fruit of the fraud perpetrated upon him, provided he could find such certificate in the hands of the alleged payee, or could trace it into the hands of another who had notice of his equity and was not an innocent purchaser for value.   This question is fully discussed in the *Frink* case, supra.   The plaintiff did not, by any allegation in any of his pleadings, charge the Emmetsburg National Bank with any notice of his defense.   It is also a perplexing omission from plaintiff's pleadings that he does not claim to impress any trust upon such certificate in his own behalf.   The following are the allegations of his petition as against the Continental National Bank:

"That the Emmetsburg National Bank and the said Bernard Ulrich, as receiver, claim to hold the said certificate of deposit because of an alleged claim by the defendant, the Continental National Bank of Sioux City, Iowa, that it is the owner and holder of the said certificate of deposit; but plaintiff alleges that, by reason of the premises, the Continental National Bank of Sioux City, Iowa, is not entitled to any funds or deposit pur-

porting to be represented by said certificate, and the said certificate does not, in fact, represent any deposit of funds, but the said promissory notes or any alleged proceeds thereof or any liability represented by said certificates are not the property of the said Continental National Bank, and it has no right, title, or interest whatsoever in the premises against the Emmetsburg National Bank or the said Bernard Ulrich, as receiver, or this plaintiff, and the said certificate of deposit is wholly void in its hands. That the plaintiff's interest in the said promissory notes is the full ownership thereof, and that the value of the said promissory notes, because of their possible misuse and as evidenced, is, to wit, a sum equal to their face, with interest; that said promissory notes were neither taken on the order or judgment of a court against the plaintiff or under an execution or attachment against him or against the property. That the Continental National Bank of Sioux City, Iowa, is, by reason of the premises, *indirectly claiming an interest in the said promissory notes,* but it in fact has no interest, direct or indirect, therein. Wherefore, plaintiff demands judgment against the defendant for the immediate possession *of the said two promissory notes,* or for the value thereof, and costs.''

No other allegations are made as against the Continental National Bank, nor does the prayer pray that a trust be impressed upon the *certificate,* but only that the *notes be canceled.* So far, therefore, as the pleadings are concerned, the Continental National Bank is before us with its cross-petition, whereby it asked judgment upon the certificate against the Emmetsburg National Bank. No defense was pleaded by the maker, nor any defense to it proved by any evidence. What ground, therefore, was there, either in the pleadings or the evidence, for the cancellation of the certificate? The only defense to it purported to be made in the pleading was by the plaintiff in his reply. This was, in effect, a general denial. Such denial was a mere formality. It had no support in the evidence. The instrument was valid, as against the Emmetsburg National Bank. It is not claimed by anyone that any fraud was perpetrated upon it, even by the Midland Packing Company. The certificate was issued, and it was transferred for value to the Continental National Bank. The issuing bank had no defense thereto. The plaintiff

had no right to defend against it. He had no interest in defending against it. Whatever interest he had was to sustain the instrument and to impress a trust upon it in his own favor, and even this right was not due him after he had obtained a cancellation of his notes.

Plaintiff's argument, as against the Continental National Bank, is predicated largely upon the proposition that it was not a holder in due course of the instrument, because the instrument was drawn payable in "current funds," and because it was negotiated by agents other than the treasurer. This argument is available only to the issuing bank, and is available to it only in support of an actual defense to the instrument. Inasmuch as it made no defense, and has none, the question of the negotiability of the instrument is not material. If the plaintiff were tracing this asset as a fruit of the fraud practiced on him, and were asking to impress a trust thereon, he could not have such relief, as against an innocent purchaser for value. In such a case, the question whether a purchaser was innocent would not depend upon the negotiability of the instrument. The protection afforded to innocent purchasers of property of whatever kind against the impressment of a trust because of hidden equities is independent of the Negotiable Instrument Act, and will operate in favor of a nonnegotiable instrument, as well as in favor of a negotiable one. Before the plaintiff could be entitled to impress a trust upon such certificate in his own favor, it was incumbent upon him to show, either directly or circumstantially, that the taker of the certificate had notice of an adverse equitable claim to that certificate. We do not find in the record any evidence whatever that has any tendency to prove notice to such bank that any person other than the issuing bank and the payee had any claim upon or interest in the certificate in question. If, therefore, the plaintiff had asked to impress a trust in his favor upon such certificate, it would have to be denied, for want of proof of notice. Such notice is not proved by the mere nonnegotiability of the instrument.

It is earnestly urged in argument that no contractual relation had, in fact, been entered into between the plaintiff and the Midland Packing Company, and that, therefore, the notes were

2. TRUSTS: constructive trusts: innocent party.

a nullity from the beginning, and that, therefore, they furnished no consideration to the Emmetsburg National Bank for the issuance of its certificate. If that were so, it would be a defense available to the issuing bank, and not to the plaintiff. This fact could be available to the plaintiff only as a ground for cancellation of its notes in the hands of the Emmetsburg National Bank. This argument for the plaintiff is predicated upon an amendment to his petition filed during the trial. By this amendment, he withdrew the tender previously made, and pleaded that the contract which he had signed had been altered at the home office, and that he had never assented to the alteration, and that the contract was, therefore, nugatory. The facts disclosed by such pleading were that some of the officials of the company, apparently with the purpose of defrauding the company in their own interest, had made a certain memorandum on the contract, which indicated the particular officials who were to gain particular benefits from this contract. This memorandum was made after the contract between plaintiff and the Midland Packing Company was complete. It was not an alteration of the contract. The mutual obligations of the plaintiff and the Midland Packing Company under said contract remained precisely the same, notwithstanding such memorandum. The allegation, therefore, that no contractual relation existed was a mere conclusion by the pleader, and was not supported by the facts disclosed in the pleadings or in the evidence.

We see no way, therefore, to sustain the decree as against the Continental National Bank; nor can we discover any reason why, upon the undisputed evidence, as well as upon the pleadings, judgment should not have been rendered in its favor against the issuing bank. We ought to note at this point that, while this action was pending, the Emmetsburg National Bank went into the hands of a receiver, and that it is now represented herein by the receiver. What is said in this discussion is not intended to establish any preference in favor of the Continental National Bank as against the receiver, nor to adjudicate in any manner the question of the distribution of the funds in the hands of the receiver.

II. We turn next to a consideration of the appeal of the Emmetsburg National Bank. Can the decree of cancellation of

the notes be sustained? The case seems to have been brought,
in the first instance, at least, as a friendly suit
between the plaintiff and said bank. The peti-
tion contained no allegation hostile to said bank.
If the plaintiff is entitled, as against said bank, to a cancellation
of these notes, it must be predicated upon some specified ground.
The only ground specified by plaintiff in his petition or in any
of his amendments, as against the bank, is that it parted with
no consideration therefor. There is no allegation that the bank
had notice or was charged with notice of any defense to these
notes, nor is there evidence of anything but the utmost innocence
and good faith on the part of the agents of the bank who pur-
chased them. The plaintiff was immediately advised of the pur-
chase. He repeatedly assured his associates that they were all
right. For nearly one year, he himself knew no defense to the
notes. This was his third purchase of stock from the same com-
pany. He had acted as agent for the same company in selling
stock to others. If he himself knew no defense to the note, why
should it be inferred that his associates knew of any? Though
these declarations on his part to his associates in the bank did
not necessarily constitute an estoppel against him, as pleaded
by the Emmetsburg National Bank, because they were made
after the purchase of the notes, they constitute very persuasive
evidence that there was no source of information available to
his associates from which it would be likely that they could
have obtained any notice of an existing defense to the notes.

3. BILLS AND
NOTES: indorse-
ment: prima-
facie authority.

The final facts upon which the plaintiff here rests the weight
of his argument were first pleaded by him in certain amendments
filed in the course of the trial, which facts were unknown to him,
according to his allegations, prior to the trial.

In another division hereof, we shall deal in more detail with
the pleadings and with certain salient features of the evidence.
We omit such details at this point.

One point urged pursuant to such amendments is that the
Midland Packing Company never received title to the notes, be-
cause no contractual relation was ever consummated between
it and the plaintiff. As will be seen later, the evidence is against
the plaintiff on this point.

Another point urged pursuant to the same amendment is

that the Emmetsburg National Bank never received title to the notes from the Midland Packing Company, for want of an authorized indorsement. The notes purported to be indorsed by the Midland Packing Company, by O'Donnell. O'Donnell was the agent with whom plaintiff transacted the business. The claim is that Burlingame, the secretary, was the appropriate officer to make such indorsement. Plaintiff put in evidence a resolution adopted by the board of directors, whereby Burlingame was "exclusively authorized to do all acts and things necessary to and empowered to bind the Midland Packing Company in all negotiations for the sale of its securities, or enter into obligations for the use of money for the said Midland Packing Company." There is nothing in the foregoing which would forbid the corporation from conferring like authority on others, or forbid Burlingame from giving verbal approval of the sale and indorsement of the said notes. It was not essential to the regularity of the indorsement that the authority of O'Donnell should appear as a part thereof. *Bettis v. Bristol*, 56 Iowa 41, 42; Section 3060-a19, Code Supplement, 1913. He was an agent of the company. He had possession of the instruments and delivered the same. This was prima-facie proof. Further proof is found in the fact that the certificate of deposit issued by the bank and delivered to O'Donnell was later delivered to Burlingame, and was by him indorsed in blank. In this condition, O'Donnell and Taylor, the general fiscal agent of the company, later negotiated it to the Continental National Bank. These facts constitute a ratification by the company, through Burlingame. The plaintiff's contract was on file with the appropriate officers of the corporation. We think there was no defect in the title of the bank at this point.

III. We purpose in this division to set forth in more detail some features of the pleadings and of the evidence upon which special emphasis is laid by the appellee. Upon the trial of the case, he filed two amendments to his petition, which we will denominate herein as A and B, as follows:

4. CONTRACTS: effect of invalidating fraud.

A. "Plaintiff amends his substituted petition by stating that there never was any contract or subscription between the plaintiff and the Midland Packing Company, and plaintiff did

not discover that the defendant Emmetsburg National Bank was not the bona-fide owner or holder of the said promissory notes, or that, as plaintiff now avers, it had no title thereto, or that the purported indorsements thereon, as plaintiff has since found and now avers, were not the indorsements of the Midland Packing Company, until long after this action was begun; and this. plaintiff says that, by reason of the premises, *there never was any contract between the plaintiff and the Midland Packing Company,* and the said promissory notes never became the promissory notes of the Midland Packing Company, and were never its property, and the said certificate of deposit never represented any actual funds deposited, and the Continental National Bank never acquired any certificate of deposit or funds represented thereby. That, while the plaintiff, prior to the commencement of this action, offered to pay the defendant National Bank the difference between the amount of the said deposit and amount of said funds, the said offer was made by mistake, and in ignorance of the facts and of the plaintiff's rights in the premises.''

B.   ''Plaintiff amends his substituted petition by stating that the purported subscription to stock and promissory notes signed by this plaintiff, as set forth in his substituted petition, were and are illegal and void and without consideration, in that, by certain fraudulent arrangements between the Midland Packing Company and its promoters, organizers, and controllers, the stock of the Midland Packing Company had, unknown to this plaintiff, been so manipulated, and such arrangements had been made between them, that the Midland Packing Company would not receive and was not to receive the par value of the stock so pretended to have been sold to this plaintiff, but that at least one fourth of the par value thereof was to be, and was in fact, appropriated to the private use of the exploiters, promoters, organizers, and controllers of said corporation, and thereby the said company was, by the said purported agreements in reference to the stock so purported to have been purchased by this plaintiff, to issue stock to this plaintiff when the amount of the par value to be paid by him therefor was paid, notwithstanding that the said company would not receive and was not to receive such par value.''

It will be noted that, by Amendment A, plaintiff avers ''that

there never was any contract or subscription between the plaintiff and the Midland Packing Company;'' and that ''the said promissory notes never became the promissory notes of the Midland Packing Company, and were never its property.'' By Amendment B, it is averred that the subscription and the promissory notes were illegal and void, because of certain fraudulent arrangements between the company and its promoters whereby the promoters received one fourth the par value of the stock, and that they would accordingly receive one fourth of the par value of the stock subscribed for by the plaintiff. Plaintiff's subscription contract was as follows:

''Subscription Contract to Capital Stock.
''No. 10114.                                    No. Shares
  ''Midland Packing Company,
   ''Sioux City, Iowa.
''Authorized Capital Stock $8,000,000.00.
'' (Incorporated under the laws of the State of Iowa)
''Par Value $100.00 Per Share.    Fully paid and Nonassessable
 ''I hereby subscribe for 250 shares of the capital stock of the Midland Packing Company, Sioux City, Iowa, and agree to pay therefor, One Hundred ($100.00) Dollars per share, payable as follows: Not less than one fourth cash, accompanying this application, and the balance thereof, as evidenced by my promissory note of this date, with interest at six per cent.

 ''This subscription contract is entered into with the understanding that the capital stock of said corporation is composed of cumulative participating preferred stock and common stock; that the stock hereby subscribed for is preferred stock, and the preferred stock is guaranteed seven (7 per cent) per cent dividend for each year, after said preferred stock receives seven (7 per cent) per cent. Dividends for the current year any accumulation thereon. The common stock shall receive seven (7 per cent) per cent for the current year. Any additional dividends paid in that year shall be paid at the same rate on all stock, both preferred and common, without distinction as to class.

 ''This contract is entered into with the further understanding that the voting power at all stockholders' meetings is lodged in the holders of common stock.

"It is expressly agreed that no stock is to be issued until the amount of this subscription and note given therefor is paid in full in cash, and any payment becoming due on the stock hereby subscribed for or any note given therefor, not paid within sixty days after due, shall at the option of the corporation cause this subscription and any note or notes given herefor, to become null and void, and all payments made on this subscription by the subscriber shall become the property of the corporation absolutely as liquidated damages for the failure of the subscriber to carry out this contract.

"The company may reject this application by refunding all moneys paid thereon.

"This subscription contract contains the entire contract between the subscriber and the company, and no agent or representative of the company or any other person has any power to change or alter the terms of this subscription.

"I hereby agree that before selling or agreeing to sell the stock hereby subscribed for, that I will first offer same to the Midland Packing Company.

"All payments will be made payable to the Midland Packing Company at Sioux City, Iowa.

"Dated this....day of.........., 1919.

"Henry Wegener,
"Subscriber."

It appears also that, when this contract was filed by the company, a memorandum was stamped thereon with a rubber stamp, as follows:

"Stock upon this application was subscribed upon the request of T. G. Taylor transferred from subscription No. 8580 subscribed for on the......day of ............1918."

The explanation of this memorandum made in the evidence is that Taylor was to obtain credit for this subscription, and that the same was to apply as a credit of 250 shares upon a certain contract of subscription previously made by him. The evidence also shows that the promoters of the corporation received as their commissions 25 per cent of all subscriptions. Do these facts sustain the plaintiff's allegation that there was never any contract between him and the Midland Packing Company?

Without minimizing to any extent the fraud practiced by these agents upon the plaintiff, did he, nevertheless, knowingly and intentionally execute and deliver the subscription contract and the promissory notes? · Was not this the very thing which he was induced to do by the false representations? Though he had a right to repudiate and to rescind, yet, until he did rescind, was it a contract? Could he have enforced it by a suit against the company? We ignore, for the moment, the rubber stamp memorandum. The very essence of the fraud in this case is that plaintiff was induced to enter into contract by the alleged fraud. The fraud rendered it voidable at the election of the plaintiff, and not at the election of the Packing Company. If an oil well had gushed or a gold mine had been discovered upon the property, the plaintiff could have claimed his stock, subject to the terms of the contract. If the Packing Company had brought an action against its preying officials, and had recovered from them all that had been illegally taken by them, the plaintiff would have been entitled to take the benefit as a subscribing stockholder, under his contract.

It must be said, therefore, that there *was* a contract, if *that be a material fact in this case.* But the really *material* question is, Did the plaintiff execute and deliver his negotiable promissory *notes* to the Packing Company? If so, they

5. BILLS AND NOTES: bona-fide purchasers: scope of protection.

implied a consideration, and the holder in due course had a right to rely thereon as such, regardless of whether there was a consideration in fact or not. And this answers likewise the contention of the plaintiff that the rubber stamp memorandum put upon his contract at the home office was an alteration of his contract, or was a conditional acceptance thereof, to which the plaintiff had never consented. If all this were true, it would not affect the validity of plaintiff's negotiable promissory notes in the hands of an innocent purchaser. But, in fact, the memorandum in question had no legal effect whatever upon plaintiff's rights under his contract. Whatever rights the plaintiff had against the corporation under his subscription contract before the memorandum was made, he had no less thereafter.

Counsel argue at this point that the notes were part of the contract, and that, therefore, they could not circulate except as

a part of the contract. The law is uniformly settled otherwise. The negotiability of a negotiable promissory note is not affected by the mere fact that it is given pursuant to an unperformed executory agreement. Counsel relies upon *Todd v. State Bank of Edgewood*, 182 Iowa 276. That was a case wherein an executory contract for the sale of land, together with the purchase-money notes attached thereto, was assigned by the vendor to a third party. The due date of the notes was postponed until and after the date of the performance of the executory contract. We held that the assignee of the contract from the vendor stood in the shoes of his assignor and that he took the contract and the notes as parts of the same transaction. Such they were, as between the original parties. If, in that case, the vendor had separated the notes from the contract, and had sold them to innocent parties, for value, they would not have been subject to such defense. That distinction is distinctly preserved in the opinion in that case. It appears also from the evidence that the plaintiff contracted with O'Donnell, whereby O'Donnell was authorized to resell such stock for the plaintiff at an advance of $25 per share. The profit thus to be made was to be divided equally between plaintiff and O'Donnell. Concerning this contract, the plaintiff testified:

"That it would be taken care of by someone else, paying a higher figure; and it was this statement that he was going to resell the stock that induced me to buy it; and I felt that he could sell it for $125 per share, and that he would divide the $25, and I would make a profit of $12.50 per share out of it, and that I would never have to pay the notes, because my stock would be resold. He said the notes would take care of themselves, out of the profits. I relied upon his statement that he would go out and sell the stock.

"Q. Wasn't that the thing that induced you to make the subscription? A. Yes, sir. Q. You spoke to Mr. Morling about these agents' telling you other things at the time you made this last purchase of stock; but the fact is, you wouldn't have made the purchase if you hadn't believed the stock was going to be resold, would you, Mr. Wegener? A. No, sir. Q. You depended upon the agent's statement, then, that he was

going to resell the stock, as the real thing that induced you to take the stock? A. Yes, sir.''

This evidence has an important bearing upon two features of the case. If O'Donnell had sold this stock at a profit, the plaintiff would have been entitled to his profits, and this right would arise to him under his existing contract of purchase. The evidence is important, also, as bearing upon the question of notice to his associate bank officials, who purchased the notes. Plaintiff assured them that the notes were all right, and would be paid. He did not claim that they had been negotiated in breach of faith. He was expecting to resell the stock. He so informed his associates. This was his attitude for the period of one year. He was not expecting to defraud any purchaser in making such sale. He had been familiar with the operations of this company for a couple of years. He had been at its headquarters two or three times. He had inspected the plant. He had aided the promoting agents in their canvass for purchasers among his neighbors. These acts showed his confidence in the integrity of the corporation and its agents. If, therefore, there was anything in the circumstances that put his co-officials upon inquiry, to what better source could they have properly and naturally put their inquiry and their search for information than to the plaintiff himself? There is nothing in the evidence that would warrant the slightest suspicion that the bank officials who purchased the notes knew anything that would suggest any right of defense thereto. Such is their testimony. The plaintiff knew more about the corporation and his transactions therewith than they did. They knew that he was satisfied. We see no room for saying, upon this record, that these bank officials had knowledge of any fact which put them upon other inquiry than from the plaintiff himself. The evidence of the plaintiff himself is conclusive that such an inquiry, if it had been formally made in advance of the purchase, would have disclosed no impeachment of the notes or of their negotiation.

IV. We have engaged in the foregoing somewhat prolix discussion of the evidence because of the grave importance of the case and of the zealous contention and manifest conviction of plaintiff's distinguished counsel that the record sustains the decree in his favor, and because our conclusion upon the record

runs counter to the views of the learned trial judge.  The result
we thus reach is disastrous to the plaintiff, and we reach it with
solemn reluctance.  Though the plaintiff is not wholly blameless,
he has suffered a colossal injustice at the hands of the directing
officials and stock-selling agents of the corporation.  They not
only stripped him, but they stripped the parent corporation,
whose stock they sold him.  In the sanctum of the corporation
itself, they fed and fatted upon its subscribing capital like beasts
of prey upon the quarry.  A court of equity is properly zealous,
in such a case, to use its large powers to give redress for such
wrongs against the original wrongdoers, and as against all others
who aid and abet and furnish cover for the protection of titles
and property thus acquired from the injured party, in so far as
the same can be done consistently with the protection of the
fundamentals of commerce.  And this means the protection of
all legitimate commercial transactions which are made in good
faith in the course of trade.  In the redress of such a wrong, the
court is under the limitation always that subsequent transactions,
entered into for value and in good faith, must be protected, even
though redress to the plaintiff thereby fails.  It is not permitted
to become a whirlwind, striking the guilty and the innocent alike.
It must discriminate, and it must protect the innocent pur-
chaser.  The learned judge below indicated to some extent the
ground of his holding.  He did not find that the Continental
National Bank was not an innocent purchaser of the certificate
of deposit.  He did reach the conclusion, pursuant to many of
our decisions, that the certificate was nonnegotiable in form, and
that, therefore, the purchaser could not be a holder in due course.
Upon this premise, he assumed that the certificate was invalid
and void in the hands of the bank, even though the bank had
paid value therefor in good faith, and even though the maker
had no defense thereto.  This latter was the palpable error into
which the court fell, and is itself explanatory of the decree as
a whole.  This conclusion being reached, the rest followed quite
naturally.  The cancellation of the certificate operated wholly
to the benefit of the Emmetsburg National Bank, though it had
not asked such relief.  After it had been thus relieved of its
obligation to pay the certificate of deposit, horseback equity
would forbid that it should recover upon the notes also, even

though it be a holder in due course. Hence their cancellation. By this form of decree, the plaintiff took even more benefit than he could have received if a trust had been impressed in his favor upon the certificate, as against the Continental National Bank. If the title to the certificate had been thus awarded to him, he would have been entitled, at best, only to the amount thereof which he could have applied as a credit upon his larger notes. But in view of the insolvency of the issuing bank, he could only participate thereunder in the distribution of the insolvent estate. The decree operated as a cancellation of ''war debts,'' and gave to plaintiff more than equity, even if it had been found that the Continental National Bank was a purchaser in bad faith. And this doubtless explains the reason why the alert counsel for the plaintiff so persistently omitted to ask for the impressment of a trust upon the certificate. The question of negotiability in the form of the certificate of deposit was not a material one, as we have pointed out in the *Frink* case, supra. Such a question could be material only in the event of a defense by the maker. The plaintiff had no standing to defend against the validity of the instrument, nor had he any interest so to do. He did have an interest in sustaining it and in impressing a trust thereon in his own favor, if he could, and in recovery thereon. In order to prevail at this point, it was incumbent upon him to show some degree of notice to the purchasing bank sufficient to put it upon inquiry; not that the certificate was subject to *defense,* but that the *title* and equitable ownership of it were subject to dispute.

What we have already said indicates our conclusion that the Continental National Bank was a good-faith purchaser of the certificate for value, and that the Emmetsburg National Bank was likewise a good-faith purchaser of the notes, and was a holder in due course thereof. The decree entered below must, accordingly, be reversed.—*Reversed.*

PRESTON, C. J., STEVENS, ARTHUR, and FAVILLE, JJ., concur.